AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Middle District of Louisiana

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>THE ELYSIAN APARTMENTS, 1120 SPANISH TOWN<br>ROAD, APT. 209, BATON ROUGE, LA 70802 | )<br>)<br>)  Case No. 21-MJ-55<br>)<br>)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT "A"

located in the _____Middle_____ District of _____Louisiana_____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 §1343 | Wire Fraud |
| 18 §1028A(a)(1) | Aggravated Identity Theft |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Anthony Coliston, Special Agent, DOL-OIG
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date: _____May 10, 2021_____

_____
*Judge's signature*

City and state: _____Baton Rouge, Louisiana_____

Scott D. Johnson, U.S. Magistrate Judge
*Printed name and title*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE MIDDLE DISTRICT OF LOUISIANA**

IN THE MATTER OF THE SEARCH OF:
**THE ELYSIAN APARTMENTS**
**1120 SPANISH TOWN ROAD**
**APARTMENT 209**
**BATON ROUGE, LA 70802**

Magistrate No. ___21-mj-55___

**AFFIDAVIT IN SUPPORT OF AN**
**APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Anthony Coliston, being first duly sworn, hereby depose and state as follows:

**I.    INTRODUCTION AND AGENT BACKGROUND**

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as **The Elysian Apartments, 1120 Spanish Town Road, Apartment 209, Baton Rouge, Louisiana, 70802**, occupied and controlled by **Shawnda AUGUSTUS ("AUGUSTUS")**, hereinafter "**SUBJECT PREMISES**," further described in Attachment A, for the things described in Attachment B.

2.    I am a Special Agent with the United States Department of Labor, Office of Inspector General (DOL-OIG), Office of Investigations (OI). I have been employed as a Special Agent with the DOL-OIG since February 2018 and I am currently assigned to the Houston Field Office. I am a graduate of the Federal Law Enforcement Training Center in Glynco, GA and possess a Bachelor's degree.

3.    As a DOL-OIG Special Agent, I have participated in and conducted investigations of criminal activity including unemployment insurance (UI) fraud, identity theft, money laundering, theft of government funds, labor racketeering, program fraud, theft of employee

benefit plans, embezzlement, visa fraud, and other related financial crimes. These criminal investigations included crimes involving the violation of 18 U.S.C. § 1001, 1341, 1343, 641, and 1028. I have executed and participated in the execution of numerous search warrants for violations of federal laws which resulted in the development of evidence in every instance. I have gained experience in the conduct of such investigations through previous case investigations, formal training, and in consultation with law enforcement partners in local, state and federal law enforcement agencies.

4.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from others, including but not limited to civilian witnesses and experts. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 1343 (Wire Fraud); Title 18, United States Code, Section 641 (Theft of Government Funds); Title 18, United States Code, Section 1040 (Disaster Fraud); Title 18, United States Code, Section 1029 (Identity Theft); and Title 18, United States Code, Section 1028A (Aggravated Identity Theft) (collectively, the **"TARGET OFFENSES"**), have been committed by **AUGUSTUS**, and others known and unknown to law enforcement. There is also probable cause to search the places described in **Attachment A** for evidence, instrumentalities, and/or fruits of these crimes further described in **Attachment B**.

## II.    <u>PREMISES TO BE SEARCHED</u>

6.    The **SUBJECT PREMISES**, namely, 1120 Spanish Town Road, Apartment 209, in Baton Rouge, is a unit leased by **AUGUSTUS** and her daughter, Bruin Augustus, in The Elysian, a multi-family residential property. The Elysian is owned, operated, and controlled by Gulf Coast Housing Partnership ("GCHP") Management, LLC, a limited liability corporation with its principal place of business at 5905 Hooper Road in Baton Rouge, Louisiana. The **SUBJECT PREMISES** is more fully described in Attachment A.

## III.    <u>BACKGROUND</u>

### <u>FEMA's Disaster Unemployment Assistance Programs</u>

1.    The Federal Emergency Management Administration's ("FEMA") Disaster Unemployment Assistance ("DUA") program provides unemployment benefits to individuals who have become unemployed as a direct result of an incident that resulted in a Presidential major disaster declaration and who are not eligible for regular state unemployment insurance.

2.    The U.S. Department of Labor ("DOL") oversees the DUA program in coordination with FEMA. Following a Presidentially declared major disaster, FEMA provides funds to the DOL for payment of DUA benefits and reimburses the state for administrative costs associated with DUA benefits.

3.    DUA is administered by the state's unemployment insurance agency. Once funding is in place, the unemployment insurance agency will issue payments to eligible applicants, as long

3

as the individual's unemployment was, and continues to be, a direct result of a declared disaster event.

4.    On March 13, 2020, the President declared a national emergency as a result of the Covid-19 (coronavirus) pandemic.

5.    Shortly thereafter, on March 27, 2020, the President signed into law the Coronavirus Aid, Relief and Economic Security ("CARES") Act. The CARES Act was designed to mitigate the economic effects of the COVID-19 pandemic by providing emergency assistance for individuals, families, and businesses.

6.    The CARES Act included a provision for Pandemic Unemployment Assistance ("PUA"), a temporary federal unemployment insurance program for individuals who lost employment due to the pandemic and who were not eligible for regular unemployment compensation.

7.    The PUA program is federally funded and administered by states.  Each state's procedure is substantially the same in that it is administered by the state's department of labor.

8.    In order to obtain PUA benefits, eligible residents must initiate a claim.  In most states, these unemployment claims are filed online through websites organized and maintained by the state's unemployment agency.   The applications include, among other things, the applicant's name, date of birth, social security number, mailing address and phone number.

9.    In most cases, applicants are required to substantiate employment or self-employment that was affected due to the Covid-19 pandemic.  The amount of unemployment

benefits for which a claimant might be eligible is determined based on a variety of factors, including, but not limited to, the length of his/her previous employment and the amount of wages he or she earned.

10.     Once a claimant's application is approved, state agencies employ different ways of providing claimants PUA benefits.  Some states transfer the claimant's PUA benefits to the bank account listed by the claimant on his/her online application, while others transfer PUA funds to a prepaid debit card which is mailed to the address provided by the claimant in his/her online application.

11.     PUA funds paid by state agencies are a benefit authorized, transported, transmitted, transferred, disbursed, and paid in connection with a presidentially declared major emergency within the meaning of Section 401 of the Robert T. Stafford Relief and Emergency Assistance Act, Title 42, U.S.C. Section 5170.

## IV.    RELEVANT INDIVIDUALS AND ENTITIES

12.     The Louisiana Workforce Commission ("LWC"), located in Baton Rouge, Louisiana, administers the PUA program for the State of Louisiana.  The LWC pays PUA benefits via direct deposit or by prepaid debit cards issued by U.S. Bank, a financial institution domiciled in Minneapolis, Minnesota.

13.     The Georgia Department of Labor ("GA-DOL"), located in Atlanta, Georgia, administers the PUA program for the state of Georgia.  GA-DOL contracts with Conduent, Inc.

5

("Conduent"), a corporation domiciled in Florham Park, New Jersey, to disburse PUA benefits on behalf of the state of Georgia to claimants via direct deposit or by prepaid debit card.

14.    The Arizona Department of Economic Security ("AZ-DES"), located in Phoenix, Arizona, administers the PUA program for the state of Arizona.  AZ-DES pays PUA benefits via direct deposit or by prepaid debit card issued by Bank of America, a financial institution domiciled in Charlotte, North Carolina.

15.    The Tennessee Department of Labor ("TN-DOL") administers the PUA program for the state of Tennessee.  TN-DOL contracts with Conduent, a corporation domiciled in Florham Park, New Jersey, to disburse PUA benefits on behalf of the state of Tennessee to claimants via direct deposit or by prepaid debit card.

16.    Cox Communications, Inc. ("Cox"), is an internet service provider domiciled in Atlanta, Georgia.  Cox provided telecommunications services to customers in multiple states, including Louisiana.

17.    **SHAWNDA ROCHELLE AUGUSTUS ("AUGUSTUS")**, **a.k.a. SHAUNDA AUGUSTUS**, defendant herein, is a resident of Baton Rouge, Louisiana.  Beginning in approximately March 2020, and continuing through the present, **AUGUSTUS** submitted claims for PUA benefits in her name, and in the names of other individuals, without their knowledge or consent, in multiple states, including Louisiana, Georgia, Arizona, Nebraska, Hawaii, Tennessee, among others.  **AUGUSTUS** maintains a bank account ended in x9527 at Baton Rouge Telco Federal Credit Union ("BR Telco"), located in Baton Rouge.

6

18.    Individual A is a resident of Baton Rouge, Louisiana.  In 2016, the President issued a disaster declaration for parts of Louisiana affected by historic flooding. Individual A is a close friend of **AUGUSTUS'** who has admitted to filing false claims for DUA benefits in his/her own name, and in the names of other individuals, following the floods of 2016.  Individual A stated that **AUGUSTUS** assisted him/her in the filing of those claims.  Specifically, Individual A stated that **AUGUSTUS** provided him/her with false documents that could be submitted to LWC as proof of prior employment.  Individual A has provided law enforcement with certain information regarding **AUGUSTUS**' criminal activities in hopes of receiving credit for his/her assistance in his/her own criminal matter.  Nonetheless, law enforcement has corroborated Individual A's statements with other evidence, and believes the information provided by Individual A contained herein to be credible.

## V.    FACTS SUPPORTING PROBABLE CAUSE

19.    There is probable cause to believe that **AUGUSTUS** committed the TARGET OFFENSES, and the evidence, fruits, and instrumentalities of these crimes will be found at the **SUBJECT PREMISES**.

20.    The instant investigation began following the floods of 2016.  The LWC employed fraud controls to identify false or fraudulent DUA applications.  These fraud controls included searching for claims that shared common identifiers, such as the same email or mailing addresses, across multiple applications.  LWC identified over 100 suspicious DUA claims using these methods.

21.     LWC reviewed records of all applications that (a) used the same mailing address(es) for the DUA debit cards; (b) used the same self-employment supporting documentation (contracts, screenshots of websites); or (c) originated from the same IP addresses.   Approximately forty (40) of these claims had a connection to **AUGUSTUS,** Individual A, or both.

22.     For example, **AUGUSTUS** submitted a claim for DUA benefits in which she claimed loss of self-employment income due to the floods.  In support of this claim, **AUGUSTUS** provided LWC with a contract for purported catering services as proof of prior employment.  However, there are no records indicating that **AUGUSTUS** was employed in 2016, such as wage records or business entities registered in her name.

23.     Of the suspicious claims, approximately nineteen (19) DUA applications requested payment by debit card and listed **AUGUSTUS'** mailing address.  Contracts nearly identical to the catering contract submitted by **AUGUSTUS** were also submitted across multiple applications.

24.     Approximately nineteen (19) of the suspicious claims identified by LWC requested payment by debit card and listed **AUGUSTUS'** mailing address**.**  These fraudulent claims were filed using the personal identifying information ("PII") of other individuals, and often included contracts nearly identical to the catering contract submitted by **AUGUSTUS** across multiple applications.

25.     As a result of the claims, LWC issued debit cards in the names of those individuals. The debit cards were mailed from U.S. Bank, located in Minnesota, to AUGUSTUS' residential address. Records obtained from U.S. Bank indicated that the debit cards had been used at ATMs in or around the Baton Rouge area to withdraw the DUA funds as cash.

26.     Following the passage of the CARES Act, DOL and other state unemployment agencies employed the same fraud controls to identify fraudulent claims for PUA.

27.     In or around February 2021, law enforcement received notification from DOL regarding PUA claims filed with multiple state unemployment agencies from the same Internet Protocol ("IP") address originating in the Middle District of Louisiana.  Records obtained from DOL reflected that IP address 174.64.4.237 (the "Target IP Address") was used to file over 30 fraudulent claims for PUA in multiple states, including Louisiana, Georgia, Arizona, California, Washington, Nevada, Hawaii, and Nebraska.

28.     Law enforcement sought and obtained records from Cox, the internet service provider ("ISP") that leased the Target IP Address.  Cox records reflected that at various dates and times from on or about March 2020 through at least October 2020, the Target IP Address was assigned to the following customer:

Subscriber Name:     Angela Bellello
Account Address:     **SUBJECT PREMISES**

9

29.     Agents contacted Bellello, a resident of Oscar, Louisiana.  Bellello stated that she had never resided at the **SUBJECT PREMISES**, nor had she ever established an account with Cox.

30.     Agents obtained records from Gulf Coast Housing Partnership ("GCHP"), the company responsible for the management of the **SUBJECT PREMISES**.  According to these records, law enforcement determined that beginning on February 1, 2020, the **SUBJECT PREMISES** was leased to **AUGUSTUS** and her daughter, Bruin Augustus.

31.     Agents obtained a copy of **AUGUSTUS**' Louisiana State Identification Card, on which the address listed is that of the **SUBJECT PREMISES**.

32.     Records obtained from LWC indicated that on March 31, 2020, **AUGUSTUS** submitted a claim for PUA via LWC's online portal. In her application, **AUGUSTUS** claimed loss of self-employment income due to the pandemic.   The address used on **AUGUSTUS'** application was that of the **SUBJECT PREMISES**.  The account was accessed from the Target IP address, registered to the **SUBJECT PREMISES.**

33.     Records obtained from AZ-DES indicated that on July 10, 2020, **AUGUSTUS** submitted a claim for PUA benefits using the Target IP address.  In the application, **AUGUSTUS** claimed loss of self-employment income due to the pandemic.  The address used on **AUGUSTUS'** application was that of the **SUBJECT PREMISES**.

34.     Records obtained from TN-DOL indicated that on July 10, 2020, **AUGUSTUS** submitted a claim for PUA benefits using the Target IP address.  In the application, **AUGUSTUS**

10

claimed loss of self-employment income due to the pandemic.    The address used on this application was again that of the **SUBJECT PREMISES**.

35.    Finally, on July 13, 2020, **AUGUSTUS** filed an online claim for PUA with the GA-DOL from the Target IP address.  As with the other claims reviewed, the claim submitted to GA-DOL matched **AUGUSTUS'** date of birth and social security number, and listed a mailing address at the **SUBJECT PREMISES**.  In this application, **AUGUSTUS** falsely certified that she had not applied for or received unemployment compensation under any other state or federal program. filed a claim for PUA benefits in any other state or federal program.

36.    All of the aforementioned applications requested that PUA funds be distributed via direct deposit to a bank account ending in x9527 at BR Telco.

37.    Agents obtained records for BR Telco, including monthly account statements and the signature card.  The **SUBJECT PREMISES** was listed as her address in the bank records. **AUGUSTUS** listed her employment as "Shawnda Augustus."  **AUGUSTUS** was listed as the sole signer on the account.

38.    A review of the monthly account statements showed multiple, regular deposits from various state agencies, including LWC, AZ-DES, GA-DOL, and TN-DOL, beginning in April 2020 and continuing through November 2020.

39.    For example, from July 15, 2020, until November 12, 2020, GA-DOL transmitted approximately 48 payments totaling $13,248.00 to BR Telco account x9527.  From July 15, 2020

to August 19, 2020, the TN-DOL transmitted multiple payments totaling approximately $15,552. Similar deposits can be found from LWC and AZ-DES.

40.     DOL obtained copies of all PUA applications submitted from the Target IP address. As a result, DOL identified at least twenty-three (23) separate PUA claims filed in the states of Arizona, California, Georgia, Hawaii, Nebraska, Tennessee, Nevada, Washington and Louisiana. Of these applications, at least 15 used the personal identifying information ("PII"), including names, social security numbers, and dates of birth, of other individuals.  Eight (8) of the claims provided a mailing address at the **SUBJECT PREMISES**.

41.     As of the last records check, **AUGUSTUS** listed the **SUBJECT PREMISES** on her most recent claim for PUA which was submitted to LWC in January 2021.

42.     In total, DOL estimates that to date, the actual loss attributable to these fraudulent submissions is approximately $123,000.  The investigation is ongoing, but agents continue to receive information that the actual loss is much more.

## VI.    PROBABLE CAUSE TO SEARCH THE SUBJECT PREMISES

43.     In addition to the above, agents learned additional facts providing probable cause to search the **SUBJECT PREMISES** for evidence, fruits, or instrumentalities of the TARGET OFFENSES.

44.     Agents have cause to believe **AUGUSTUS** is still residing at the **SUBJECT PREMISES**.  On February 4, 2021, FBI Agents served **AUGUSTUS** with a Target Letter at the

12

**SUBJECT PREMISES**.  The letter was left on the door of the **SUBJECT PREMISES** after numerous attempts to contact **AUGUSTUS**.  No response was received.



45.     On March 30, 2021, agents interviewed Individual A regarding his/her knowledge of **AUGUSTUS'** PUA claims. Individual A confirmed that **AUGUSTUS** resides at the **SUBJECT PREMISES**.  According to Individual A, after the target letter was left at her residence, **AUGUSTUS** contacted Individual A and asked "why you told those people my address?"

46.     Individual A further stated that he/she was familiar with the **SUBJECT PREMISES,** having last been there the week prior.  Individual A said that **AUGUSTUS** maintains fraudulent records used in the submission of PUA claims, such as fake invoices and employment documents, at the **SUBJECT PREMISES**.  Specifically, Individual A said that **AUGUSTUS** keeps the documents in boxes "scattered" around the apartment.

13

47.    Individual A said that when his/her DUA claim was initially denied following the floods of 2016, **AUGUSTUS** provided him/her with a copy of the catering contract and other documentation to submit as proof of employment with his/her appeal.    Individual A said that during the recent investigation into his/her own PUA claim, **AUGUSTUS** again offered to provide fraudulent records, which Individual A declined.

48.    Individual A also stated that **AUGUSTUS** and her daughter, Bruin Augustus, used the PUA funds, including those issued by debit cards, to purchase goods online.  Individual A said that he/she had personally seen purchases made by **AUGUSTUS** and her daughter, Bruin Augustus, at the **SUBJECT PREMISES**.

49.    Records obtained from GCHP corroborated Individual A's statements.  According to correspondence provided by GCHP, on August 7, 2020, **AUGUSTUS** was issued a notice for violating her lease agreement for dumping large amounts of trash, including empty shipping boxes, outside of the trash chute maintained by the apartment complex.  The following pictures, among others, were provided:

14





15

50.     Individual A's statements were further corroborated by bank records, which showed multiple purchases from retail stores (Walmart), online stores (such as Amazon, Ebay, AliExpress); department stores (Dillards, Macy's); shoe stores (Fila, Nike, Ugg); and luxury stores (Luis Vuitton, Gucci).

51.     Finally, Individual A stated that **AUGUSTUS** uses multiple electronic devices to execute the scheme, including computers at her residence as well as other locations, and different phone numbers and/or prepaid phones.

52.     Additional electronic evidence obtained to date support these claims.  Specifically, records of online banking sessions obtained from BR Telco indicated that **AUGUSTUS'** account was accessed using a computer, often from the Target IP address, or through a mobile app, which was accessed on both Apple and Android cellular telephones and devices.

53.     Finally, **AUGUSTUS** created email addresses associated with her fraudulent claims.  Records obtained from those ISPs indicated that several of those email addresses had been previously accessed using the Target IP address.

## VII.   TECHNICAL TERMS

54.     Based on my training and experience, I use the following technical terms to convey the following meanings:

   a.  **IP Address**: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g.,

16

121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b. **Internet:** The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c. **Storage medium**: A storage medium is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## VIII.    COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

55.    As described above and in **Attachment B**, this application seeks permission to search for records that might be found on the **SUBJECT PREMISES**, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic

storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

56.     ***Probable cause***.  I submit that if a computer or storage medium is found on the **SUBJECT PREMISES**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

57.  *Forensic evidence*.  As further described in **Attachment B**, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **SUBJECT PREMISES** because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual

19

memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and

malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the

21

computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing

22

is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.   I know that when an individual uses a computer to obtain unauthorized access to victims' personal identifying information (PII), or when an individual uses a computer to submit fraudulent electronic claims, such as in this case,   the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

58.   ***Necessity of seizing or copying entire computers or storage media***.  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic

picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

    a.   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b.   Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or

knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

59. ***Nature of examination***. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

60. Because multiple people share the **SUBJECT PREMISES** as a residence, it is possible that the **SUBJECT PREMISES** will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

25

## IX.    CONCLUSION

61.    Affiant believes that it is customary for individuals who commit mail fraud, wire fraud or other fraud against the United States Government or government programs to maintain evidence at locations within their control, such as the **SUBJECT PREMISES**.

62.    I submit that this affidavit supports probable cause for a warrant to search the **SUBJECT PREMISES**, together with all electronic devices found therein, for evidence, instrumentalities, and/or fruits of these crimes further described in **Attachment B**.

63.    In consideration of the foregoing, I respectfully request that this Court issue a search warrant for the **SUBJECT PREMISES**, authorizing the search of this location, as described more fully in **Attachment A** and the seizure of items described in **Attachment B**.

## X.    REQUEST FOR SEALING

64.    It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time.  Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums.  Premature disclosure of the contents

of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

Anthony Coliston
Special Agent
Office of the Inspector General
U.S. Department of Labor

**Affidavit submitted by email/.pdf and attested to me as true and accurate by telephone consistent with Federal Rules of Criminal Procedure 4.1 and 41(d)(3) on** <u>May 10, 2021</u> **.**

Subscribed and sworn to before me
on May 10, 2021:

UNITED STATES MAGISTRATE JUDGE

27

## ATTACHMENT A

*Property to be searched*

The property to be searched is **1120 Spanish Town Road, Apartment 209, Baton Rouge, Louisiana, 70802 ("SUBJECT PREMISES")**, also known as The Elysian Apartments, as well as any electronic devices or storage mediums found therein.  The **SUBJECT PREMISES** is further described as follows:

The **SUBJECT PREMISES** is a four (4) story multi-tenant building, with multi-color finish in Green, Grey, and White. There are no gates surrounding the complex and nine steps are affix to the front entrance.  The front entrance is used to enter the building. Upon entering the building, the elevator is located on the southwest side. Apartment 209 is located on the second floor immediately to the East of the elevator entrance.   The apartment has the number "209" affixed to the upper right side of the "brown" door that is the entrance to the unit.

The search of the **SUBJECT PREMISES** shall include all rooms, extend into desks, cabinets, safes, briefcases, purses, trash receptacles, electronic storage devices and other storage locations with the **SUBJECT PREMISES**, such as any sheds or storage structures located on the property of the **SUBJECT PREMISES,** in which items in attached **Attachment B** may be found.

The following are photographs of the **SUBJECT PREMISES**:





## ATTACHMENT B

*Property to be seized*

1.      All records relating to violations of Title 18, United States Code, Sections 1343 (Wire Fraud); Title 18, United States Code, Section 641 (Theft of Government Funds); Title 18, United States Code, Section 1040 (Disaster Fraud); Title 18, United States Code, Section 1029 (Identity Theft); and Title 18, United States Code, Section 1028A (Aggravated Identity Theft) (collectively, the **"TARGET OFFENSES"**), those violations involving **AUGUSTUS** and occurring after **March 13, 2020**, including:

     a.  Any and all records, including but not limited to, driver's licenses, ID cards, military identification cards, student identification cards, Visas, Social Security Cards, Birth Certificates and any other documents (or counterfeit(s) thereof) relating to the possession or use of means of identification of others;

     b.  Documents, records, or correspondence that may be related to bank accounts, credit card or debit card accounts, used in or obtained through the commission of the TARGET OFFENSES;

     c.  Any debit cards, credit cards, checks, cash, or other proceeds or fruits of the TARGET OFFENSES;

     d.  Any documents or records reflecting personally identifiable information, including names, social security numbers, dates of birth, driver's license numbers, credit card numbers, and bank account information ("PII"), how or where PII was used, or

where PII was acquired, and all items or documents that when used alone or in combination with another, can establish an identity;

e.  Any and all records, receipts, items, and documents reflecting the use of the United States Mails and private mailing facilities, such as Federal Express ("FedEx") and United Parcel Service ("UPS"), to further the violation of the above-reference criminal statutes;

f.  Any and all records, receipts, items, and documents reflecting the use of the United States Mails and private mailing facilities, such as FedEx and United Parcel Service UPS, for the purpose of receiving unauthorized access devices or merchandise obtained from the use of unauthorized access devices;

g.  Any and all payment devices, and/or account numbers, which evidence the possession of counterfeit or unauthorized access devices;

h.  Any and all indicia of occupancy of the **SUBJECT PREMISES** described in Attachment A to be searched, any and all cellular telephones, caller identification terminals, and their stored information, and any opened and unopened merchandise believed to be fraudulently purchased from retail merchants;

i.  Books, records, receipts, notes, ledgers, notebooks, folders, ledgers, diaries, bank records, money orders, currency, wage statements, computer files, job applications, calendars, correspondence to and from the Louisiana Workforce Solutions ("LWC"), Georgia Department of Labor ("GA-DOL"), Arizona Department of Economic Security ("AZ-DES"), Tennessee Department of Labor ("TN-DOL"), and any similar agency in any state of the United States;

2

j.  Telephone and address books, computer records or papers which reflect the names, addresses and telephone numbers of individual associated with any and all claims and payments for unemployment insurance benefits, including the names and identities of co- conspirators and victims of any such scheme and other identity theft schemes;

k.  The search shall also authorize officers to search the persons and items attached to them (such as purses, backpacks, etc.) encountered at the search location, whether they are located indoors, outdoors or in an automobile found within the location and/or the curtilage of the location.  The search shall include any and all vehicles at the location and/or within the curtilage of the location that belong to the individuals found within the property to be searched.

l.  Any computers, smart phones, or any other electronic media that were or may have been used as a means to commit the offenses described in the warrant, including usage of the computer to make Unemployment Assistance certifications via the internet;

m.  Electronic devices, including computers, cell phones, and storage mediums, related to the preparation, presentation, or transmission of unemployment applications and/or the possession or use of PII;

n.  Records and information relating to communications with Internet Protocol address 174.64.4.237;

o.  Computers or storage media used as a means to commit the violations described above, including the TARGET OFFENSES.

3

p. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    i. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    ii. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    iii. evidence of the lack of such malicious software;

    iv. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

    v. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

    vi. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

4

vii.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

viii.   evidence of the times the COMPUTER was used;

ix.   passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

x.   documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

xi.   records of or information about Internet Protocol addresses used by the COMPUTER;

xii.   records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

xiii.   contextual information necessary to understand the evidence described in this attachment.

q.   Records and things evidencing the use of the Internet to communicate with any state agency, including;

i.   Routers, modems, and network equipment used to connect computers to the Internet;

ii.   Records of Internet Protocol addresses used;

iii.   Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search

5

terms that the user entered into any Internet search engine, and records

of user-type web addresses.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, DOL-OIG may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ❏ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Middle District of Louisiana

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No.  21-MJ-55 |
| THE ELYSIAN APARTMENTS, 1120 SPANISH | ) |
| TOWN ROAD, APT. 209, BATON ROUGE, LA 70802 | ) |
| | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Middle_____ District of _____Louisiana_____ *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT "A"

This Court possesses the authority to issue this warrant under 18 U.S.C. Sections 2703(c)(1)(A) and 2711(3)(A)(i) and Federal Rule of Criminal Procedure 41.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT "B"

**YOU ARE COMMANDED** to execute this warrant on or before _____May 21, 2021,_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ❏ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Scott D. Johnson_____ .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❏ for _____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:     _____May 10, 2021, at 10:02 a.m._____          _____
                                                                                                              *Judge's signature*

City and state:  _Baton Rouge, Louisiana_____          Scott D. Johnson, U.S. Magistrate Judge
                                                                                                      *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br> 21-MJ-55 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## <u>ATTACHMENT A</u>

*Property to be searched*

The property to be searched is **1120 Spanish Town Road, Apartment 209, Baton Rouge, Louisiana, 70802 ("SUBJECT PREMISES")**, also known as The Elysian Apartments, as well as any electronic devices or storage mediums found therein.   The **SUBJECT PREMISES** is further described as follows:

The **SUBJECT PREMISES** is a four (4) story multi-tenant building, with multi-color finish in Green, Grey, and White. There are no gates surrounding the complex and nine steps are affix to the front entrance.  The front entrance is used to enter the building. Upon entering the building, the elevator is located on the southwest side. Apartment 209 is located on the second floor immediately to the East of the elevator entrance.   The apartment has the number "209" affixed to the upper right side of the "brown" door that is the entrance to the unit.

The search of the **SUBJECT PREMISES** shall include all rooms, extend into desks, cabinets, safes, briefcases, purses, trash receptacles, electronic storage devices and other storage locations with the **SUBJECT PREMISES**, such as any sheds or storage structures located on the property of the **SUBJECT PREMISES,** in which items in attached **Attachment B** may be found.

The following are photographs of the **SUBJECT PREMISES**:





## ATTACHMENT B

*Property to be seized*

1.     All records relating to violations of Title 18, United States Code, Sections 1343 (Wire Fraud); Title 18, United States Code, Section 641 (Theft of Government Funds); Title 18, United States Code, Section 1040 (Disaster Fraud); Title 18, United States Code, Section 1029 (Identity Theft); and Title 18, United States Code, Section 1028A (Aggravated Identity Theft) (collectively, the **"TARGET OFFENSES"**), those violations involving **AUGUSTUS** and occurring after **March 13, 2020**, including:

   a.   Any and all records, including but not limited to, driver's licenses, ID cards, military identification cards, student identification cards, Visas, Social Security Cards, Birth Certificates and any other documents (or counterfeit(s) thereof) relating to the possession or use of means of identification of others;

   b.   Documents, records, or correspondence that may be related to bank accounts, credit card or debit card accounts, used in or obtained through the commission of the TARGET OFFENSES;

   c.   Any debit cards, credit cards, checks, cash, or other proceeds or fruits of the TARGET OFFENSES;

   d.   Any documents or records reflecting personally identifiable information, including names, social security numbers, dates of birth, driver's license numbers, credit card numbers, and bank account information ("PII"), how or where PII was used, or

where PII was acquired, and all items or documents that when used alone or in combination with another, can establish an identity;

e.  Any and all records, receipts, items, and documents reflecting the use of the United States Mails and private mailing facilities, such as Federal Express ("FedEx") and United Parcel Service ("UPS"), to further the violation of the above-reference criminal statutes;

f.  Any and all records, receipts, items, and documents reflecting the use of the United States Mails and private mailing facilities, such as FedEx and United Parcel Service UPS, for the purpose of receiving unauthorized access devices or merchandise obtained from the use of unauthorized access devices;

g.  Any and all payment devices, and/or account numbers, which evidence the possession of counterfeit or unauthorized access devices;

h.  Any and all indicia of occupancy of the **SUBJECT PREMISES** described in Attachment A to be searched, any and all cellular telephones, caller identification terminals, and their stored information, and any opened and unopened merchandise believed to be fraudulently purchased from retail merchants;

i.  Books, records, receipts, notes, ledgers, notebooks, folders, ledgers, diaries, bank records, money orders, currency, wage statements, computer files, job applications, calendars, correspondence to and from the Louisiana Workforce Solutions ("LWC"), Georgia Department of Labor ("GA-DOL"), Arizona Department of Economic Security ("AZ-DES"), Tennessee Department of Labor ("TN-DOL"), and any similar agency in any state of the United States;

2

j.  Telephone and address books, computer records or papers which reflect the names, addresses and telephone numbers of individual associated with any and all claims and payments for unemployment insurance benefits, including the names and identities of co- conspirators and victims of any such scheme and other identity theft schemes;

k.  The search shall also authorize officers to search the persons and items attached to them (such as purses, backpacks, etc.) encountered at the search location, whether they are located indoors, outdoors or in an automobile found within the location and/or the curtilage of the location.  The search shall include any and all vehicles at the location and/or within the curtilage of the location that belong to the individuals found within the property to be searched.

l.  Any computers, smart phones, or any other electronic media that were or may have been used as a means to commit the offenses described in the warrant, including usage of the computer to make Unemployment Assistance certifications via the internet;

m.  Electronic devices, including computers, cell phones, and storage mediums, related to the preparation, presentation, or transmission of unemployment applications and/or the possession or use of PII;

n.  Records and information relating to communications with Internet Protocol address 174.64.4.237;

o.  Computers or storage media used as a means to commit the violations described above, including the TARGET OFFENSES.

3

p.  For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   i.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   ii.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   iii.  evidence of the lack of such malicious software;

   iv.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

   v.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

   vi.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

4

vii. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

viii. evidence of the times the COMPUTER was used;

ix. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

x. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

xi. records of or information about Internet Protocol addresses used by the COMPUTER;

xii. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

xiii. contextual information necessary to understand the evidence described in this attachment.

q. Records and things evidencing the use of the Internet to communicate with any state agency, including;

i. Routers, modems, and network equipment used to connect computers to the Internet;

ii. Records of Internet Protocol addresses used;

iii. Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search

5

terms that the user entered into any Internet search engine, and records

of user-type web addresses.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, DOL-OIG may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6